**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

ESTATE OF TYLER KRACHT, by and through its personal representative Jennifer Custer,

      Plaintiff,

v.

CITY OF STERLING, COLORADO, a municipality; and
OFFICER AUSTIN MOLCYK, in his individual and official capacity,

      Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

## INTRODUCTION

1.     On May 3, 2020, Sterling Police Department Officer Austin Molcyk killed Tyler Kracht by repeatedly shooting him in the back as Mr. Kracht sat dazed in his obviously disabled car.

2.     Prior to killing Mr. Kracht, Defendant Molcyk performed a dangerous maneuver forbidden by departmental policy in order to wreck Mr. Kracht's car in a head-to-head collision with his own police vehicle.

3.     After causing the crash, Defendant Molcyk approached Mr. Kracht's car with his gun drawn and began to hysterically scream at Mr. Kracht, threatening to shoot him in the head in an unhinged, profanity-laced tirade.

4.     Defendant Molcyk observed that Mr. Kracht's car was disabled. The front left tire of the vehicle, which was plainly visible as Defendant Molcyk approached Mr. Kracht's car and took up a position on the driver's side, was no longer attached to the front axle; in fact, the wheel

1

stood perpendicular to the body of the car. The left front end of the car was no more than wreckage. Defendant Molcyk could see the car's rear wheels spinning to no avail.

5.      As backup officers arrived, Defendant Molcyk continued to scream threats at Mr. Kracht at the top of his lungs. Two additional Sterling Police Officers held Mr. Kracht at gunpoint near the front driver's side window, while Defendant Molcyk shifted to a position near the rear driver's side window with his gun pointed at Mr. Kracht's head, execution style, such that laser of his intended entry point could be seen on the back of Mr. Kracht's head.

6.      Terrified, Mr. Kracht stepped on the gas of his totally disabled car; of course, absent the use of its front wheels, the car could not move. The officers observed as the wrecked car's rear wheels continued to fruitlessly spin in place as the car was clearly unable to locomote; then, Defendant Molcyk unloaded his handgun into Mr. Kracht's back and neck, striking him six times. No other officer fired their weapon.

7.      The other officers on scene dragged Mr. Kracht from his vehicle, bleeding profusely from his wounds. Mr. Kracht died shortly thereafter.

8.      The Sterling Police Department did not arrest or even discipline Defendant Molcyk for his apparent murder of Mr. Kracht, nor did it so much as reprimand Defendant Molcyk for lying to police investigators about the shooting.

### JURISDICTION AND VENUE

9.      This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All the events alleged herein occurred within the State of Colorado.

## PARTIES

11.     At all times pertinent to the subject matter of this litigation, the decedent Tyler Kracht was a citizen of the United States of America and a resident of and domiciled in the State of Colorado. Jennifer Custer is his mother and serves as the personal representative of the Estate of Tyler Kracht.

12.     Defendant City of Sterling, Colorado, is a municipality organized under the laws of the State of Colorado and is a "person" subject to suit under 42 U.S.C. § 1983. The Sterling Police Department ("SPD") is a law enforcement agency that is part of the City of Sterling. Defendant City of Sterling is responsible for the oversight, supervision, discipline, and training of SPD officers including Defendant Molcyk.

13.     At all relevant times, Defendant Austin Molcyk was a citizen of the United States and a resident of and domiciled in Colorado. At all times pertinent, Defendant Molcyk was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the Sterling Police Department.

## FACTUAL ALLEGATIONS

### Defendant Molcyk recklessly and intentionally wrecked Mr. Kracht's car

14.     On the afternoon of May 3, 2020, law enforcement officers had been involved in a vehicular pursuit of Tyler Kracht, but had correctly stopped chasing him, for their safety, the public's safety, and Mr. Kracht's safety.

15.     In contrast to the officers who had properly broken off their chase, Defendant

3

SPD Officer Austin Molcyk attempted to stop Mr. Kracht's vehicle on a country road, Highway 6, just outside of Hillrose, Colorado.

16.     At the time, Defendant Molcyk was driving his patrol vehicle west in the westbound lane of Highway 6; Mr. Kracht drove his own car, a dark-colored sedan, heading east in the eastbound lane of Highway 6.

17.     As the distance between the vehicles closed, Defendant Molcyk drew his handgun and pointed it through his windshield at Mr. Kracht.

18.     Mr. Kracht did not present a weapon or reach for one.

19.     As the vehicles drew even closer, in violation of SPD policy and in blatant disregard for his own safety and that of Mr. Kracht, Defendant Molcyk recklessly swerved his vehicle into the eastbound lane of Highway Six and initiated a head-to-head collision between the two cars.

20.     The collision shook Defendant Molcyk's patrol vehicle, which he pulled to the side of the road, but did far more damage to Mr. Kracht's car, the left front end of which entirely caved in under the force of the collision.

21.     Mr. Kracht's car came to rest in a ditch at the side of the westbound lane. The front driver's side wheel had been detached entirely from its axle; it sat perpendicular to the car in its crushed wheel well.

22.     Defendant Molcyk exited his own vehicle and ran toward Mr. Kracht's car.

23.     As Defendant Molcyk approached Mr. Kracht's car, the rear wheels of Mr. Kracht's vehicle spun repeatedly, but gained no traction at all. The car did not move. The car was obviously disabled and could not move at all under its own power.

24.     Defendant Molcyk observed that the car was disabled as he approached, a fact that was obvious from the condition of the visible front left wheel and from the fruitless spinning of the rear wheels.

25.     Defendant Molcyk began to deliver commands to Mr. Kracht as he approached the disabled car, but rather than using a command tone or otherwise attempting to establish control of the situation, he emotionally screamed at the top of his register as he menaced Mr. Kracht with his handgun.

26.     Defendant Molcyk screeched a profanity-laden tirade at Mr. Kracht, demanding that he raise his hands. Mr. Kracht compliantly raised his hands, still sitting in the disabled car.

27.     SPD Officer Tyler Chromicz and Sergeant Matt Williams arrived at the scene approximately twenty seconds after Defendant Molcyk crashed head on into Mr. Kracht and took up positions near the front driver's side window, holding Mr. Kracht at gunpoint.

28.     At this point, Mr. Kracht was trapped in a disabled car, held at gunpoint by multiple officers, and had his hands raised in the air in surrender.

29.     Defendant Molcyk's willingness to use deadly force against Mr. Kracht was already apparent, both from his reckless use of deadly force to initially wreck Mr. Kracht's car and from his drawn handgun, which he had pointed at Mr. Kracht both before he crashed into Mr. Kracht's car and throughout his address of Mr. Kracht after the crash.

30.     Defendant Molcyk announced his actual intent to use deadly force as Mr. Kracht continued to sit in the car, hands raised. Defendant Molcyk hysterically screamed, "I will kill you!" and, "I will fucking kill you!"

31.     Rather than give Mr. Kracht clear, direct commands, the SPD officers issued a

confusing mishmash of orders to Mr. Kracht regarding what to do with his hands, including orders to raise his hands simultaneous with orders to place his hands against the driver's side front window.

32.    National policing standards dictate that only one officer should issue orders to a suspect in order to prevent contradictory, confusing commands from reaching the suspect; however, at least Defendant Molcyk and Officer Chromicz simultaneously shouted conflicting orders at Mr. Kracht.

33.    The SPD officers further impeded their communications with Mr. Kracht by screaming more threats and insults as they gave their commands. Defendant Molcyk shrilly howled over his fellow officers' words, "I will shoot you in the fucking head!" while Officer Chromicz shouted, "Cocksucker!" at Mr. Kracht.

34.    Communication was even further complicated by the patrol car sirens, which rang out loudly throughout the entirety of the police interaction with Mr. Kracht.

35.    Despite these death threats and difficulties in communication created by Defendant Molcyk and the other SPD officers, Mr. Kracht attempted to tell the officers that he was not resisting arrest.

36.    Mr. Kracht advised the officers that his door was stuck—indeed, the entire driver's side of Mr. Kracht's car had been damaged in the crash.

37.    Mr. Kracht begged the officers not to shoot him in the simplest terms: "Please don't shoot."

38.    Defendant Molcyk shifted to a position near the rear driver's side window of Mr. Kracht's car, now taking aim at the back of Mr. Kracht's head from his new vantage point

through the same window.

39.     Approximately one minute after the vehicle crash, Logan County Sheriff's Deputy Casey Swingle arrived on scene to find the three SPD officers holding Mr. Kracht at gunpoint.

40.     As Deputy Swingle approached Mr. Kracht's vehicle, Defendant Molcyk and the other SPD officers shouted for him to use his baton to break out a window on Mr. Kracht's vehicle.

41.     Deputy Swingle walked toward the disabled car. As he arrived, the car's rear wheels began to spin uselessly once more; it was obvious to every person on-scene that the disabled car could not move.

42.     Mr. Kracht again raised his hands. The car did not and could not move, though the rear wheels continued to spin sporadically.

43.     As Deputy Swingle drew his baton, he accidentally dropped it back into the road, and turned to retrieve it.

44.     At this point, though Mr. Kracht's car demonstrably could not move, and though Mr. Kracht visibly had no weapon in hand—indeed, had no way to cause any harm to anyone else—Defendant Molcyk finally lost control of himself entirely, and unloaded his handgun into the back of Mr. Kracht's head and neck, firing seven shots over the course of approximately one to two seconds.

45.     Though Officer Chromicz also had Mr. Kracht at gunpoint and had a direct view of Mr. Kracht through the front driver's side window, he did not discharge his own handgun.

46.     Defendant Molcyk would later falsely tell police investigators that he fired his

weapon because he believed Mr. Kracht to be attempting to strike Deputy Swingle with his vehicle—even though the car was wholly and obviously immobile.

47.     Mr. Kracht did not brandish or otherwise present a weapon throughout the entirety of his interaction with law enforcement on May 3, 2020.

48.     Defendant Molcyk never observed Mr. Kracht to be in possession of a firearm and had no specific information that he was presently in possession of a firearm.

49.     No other law enforcement officer on scene observed Mr. Kracht to be in possession of a firearm or had specific information that he was presently in possession of a firearm.

50.     Defendant Molcyk had never contacted Mr. Kracht in a law enforcement context prior to this encounter.

51.     For a few seconds after the shooting, Mr. Kracht simply screamed in agony.

52.     When the front driver's side door to his vehicle at last swung open, Mr. Kracht lay bleeding profusely from multiple bullet wounds, and was evidently unable to move. He told the officers, "I'm dying. I'm dying," only to lose consciousness a few seconds later.

53.     Though the SPD officers pulled Mr. Kracht from his car to the roadway and made rudimentary attempts at life-saving procedures, Mr. Kracht died shortly thereafter.

**Defendant Sterling is municipally liable for Defendant Molcyk's actions and has a custom and practice of using excessive force.**

56.    It is the custom and actual practice of SPD to engage in, encourage, and condone the use of excessive force by SPD officers.

57.    SPD has a higher number of killings by police than 94% of Colorado Police Departments.[1]

58.    From 2016 to 2020, SPD had more police shootings per arrest than 54% of Colorado's police departments.[2]

59.    Sterling did not terminate or discipline Defendant Molcyk or even counsel him for his actions. Further, SPD provided no additional training to Defendant Molcyk, or other SPD officers, related to the killing of Mr. Kracht.

60.    Sterling's official position on the events regarding the shooting death of Mr. Kracht is that Defendant Molcyk's conduct was appropriate, and engaged in pursuant to all approved police policies, practices and training of the City of Sterling and the SPD.

61.    Indeed, Defendant Molcyk continued to act in the precise manner that SPD had trained him, shooting and killing another man in October 2020, before he had been cleared by the District Attorney for his summary execution of Mr. Kracht.

59.    SPD's ratification of the conduct that caused Mr. Kracht's death is not alleged as proof that this ratification itself "caused" his death.  Rather, it evidences that Defendant Molcyk's conduct was engaged in pursuant to policy, custom, and practice of Sterling; had it been *outside* of policy, disciplinary or remedial action would have been taken.

---

[1] *See* https://policescorecard.org/co/police-department/sterling.
[2] *See* https://policescorecard.org/co/police-department/sterling.

60.     Defendant Molcyk acted intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard to Mr. Kracht's federally protected rights, and acted under the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Sterling acting under color of state law.

61.     Defendant Sterling trains and tolerates its officers to use deadly force even under circumstances where the officer or a third party is not in imminent risk of death or serious bodily injury at the time of the officer shooting.

62.     Because Defendant Sterling created and tolerated a custom of deliberate indifference and failed to adequately train and supervise SPD officers in the constitutional use of deadly force, individuals like Mr. Kracht, were in danger of having their constitutional rights violated.

63.     Defendant Sterling fostered a policy of inaction in the face of knowledge that SPD officers were frequently violating specific constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, which is the functional equivalent of a decision by Sterling itself to violate the Constitution.

64.     Defendant Sterling's policy of inaction and policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of Defendant Molcyk's violation of Mr. Kracht's constitutional rights.

65.     Defendant Sterling is responsible for training its officers to ensure they perform their duties consistent with the law and supervising them to discipline their improper conduct, so officers can learn from their experiences and the experiences of their fellow officers, and be deterred from engaging in future misconduct that violates the constitutional rights of people with

whom the police interact. Sterling's failure to do so has communicated to, and trained, SPD officers, including Defendant Molcyk, that excessive force is authorized. The failure to counsel or discipline misconduct constitutes training which causes future similar unconstitutional conduct.

66.     By failing to institute policies, practices, customs, and/or training that provided SPD officers with constitutional guidance on the use of deadly force, Defendants Sterling caused Defendant Molcyk to violate Mr. Kracht's Fourth Amendment rights. As a direct result of Defendant Sterling's inadequacies in these areas, Defendant Molcyk shot Mr. Kracht and killed him.

67.     Defendant Sterling's acts or omissions caused Mr. Kracht damages because he suffered physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and death, among other injuries, damages, and losses.

68.     Defendant Sterling's actions, as described, deprived Mr. Kracht of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

<u>**STATEMENT OF CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation--Excessive Force**
**(The Estate of Tyler Kracht Against All Defendants)**

69.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

70.     Defendant Molcyk acted under color of state law, and within the course and scope

of his employment, in his capacity as officers of the Sterling Police Department at all times relevant to the allegations in this Complaint.

71.     Defendants are "persons" within the meaning of Title 42 U.S.C. § 1983.

72.     Under the Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, Decedent Tyler Kracht had a constitutionally protected right to be secure in his person against unreasonable seizures through the use of excessive force.  It is clearly established that excessive force violates the Constitution. Specifically, it has been clearly established since 1985 that it is unconstitutional to use deadly force when the officer does not have probable cause to believe the suspect posed an imminent threat of serious bodily injury or death to a police officer or any other person if not immediately apprehended.

73.     Under the application of the specific facts and totality of circumstances as described herein, Defendant Molcyk violated the clearly established constitutional rights of Mr. Kracht.

74.     Any reasonable law enforcement officer knew or should have known of this clearly established right at the time of Mr. Kracht's death.

75.     Defendant Molcyk did not have a legally valid basis to seize Mr. Kracht by use of deadly force under the circumstances present.

76.     Defendant Molcyk seized Mr. Kracht by means of objectively unreasonable and excessive deadly force when he shot Mr. Kracht to death without having a reasonable belief Mr. Kracht posed a significant threat to any officer or any other person.

77.     Defendant Molcyk had no basis to believe that he or any other person was at imminent risk of death or serious bodily injury such as to justify deploying deadly force rather

than other measures to apprehend Mr. Kracht.

78.     The decision to employ deadly force by shooting Mr. Kracht in the back of his head and neck multiple times and killing him, when other less-than-lethal force was readily available, was excessive under the circumstances.

79.     Defendant Molcyk's actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting him. Any reasonable officer in his position would have known that it was unreasonable to use deadly force under the totality of the circumstances and that to do so would violate Mr. Kracht's clearly established constitutional rights.

80.     Defendant Molcyk's actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Kracht's federally protected rights, and he engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Kracht's constitutionally protected rights.

81.     Defendant Molcyk acted as he did pursuant to and because of the customs, policies, training, and/or practices of Defendant Sterling.

82.     Defendant Molcyk's actions were the direct result of Defendant Sterling's (1) promulgation, creation, implementation, or enforcement of policies, customs, or practices that allowed SPD officers, including Defendant Molcyk, to use deadly force against people regardless of whether constitutional requirements for such force was met and/or (2) its deliberate choice to follow a course of action from among various alternatives available of not adequately training or supervising SPD officers, including Defendant Molcyk, regarding the constitutional use of

13

deadly force, given that the need for such training and supervision was so obvious, and the inadequacy of training and/or supervision was so likely to result in the violation of constitutional rights such as those described herein.

83.   Defendant Sterling knew to a moral certainty that SPD officers would be required to arrest fleeing felony suspects in the execution of their official law enforcement duties. The City armed its officers with firearms, in part to allow them to accomplish this task. Thus, in light of the duties and responsibilities of SPD officers who are inevitably called on to arrest fleeing suspected felons, the need to train SPD officers in the constitutional limitations on the use of deadly force was so obvious that Defendant Sterling's failure to do so constituted deliberate indifference to Mr. Kracht's constitutional rights.

84.   Defendant Sterling adheres to a policy and practice of permitting the use of deadly force on a suspect even when there is no immediate risk of death or serious bodily injury when the officer uses deadly force.  Adherence to such a policy makes permissible under official city policy the unconstitutional use of deadly force.

85.   Defendant Sterling knew or should have known that its acts or omissions were substantially certain to cause SPD officers, including Defendant Molcyk, to violate individuals' constitutional rights to be free from excessive deadly force, and its consciously or deliberately chose to disregard this risk of harm in adhering to its policy, custody, or practice of failing to provide that SPD officers use deadly force against fleeing felons only within constitutional limits, and/or in deliberately choosing not to provide adequate training to SPD officers in this area.

86.   Therefore, Defendant Sterling set in motion a series of events that it knew would

cause an individual in a similar situation as Mr. Kracht to be deprived of the constitutional right to be free from excessive force at the hands of law enforcement. But for the above acts or omissions of Defendant Sterling, Mr. Kracht would not have been subjected to a violation of his Fourth Amendment rights, and such a deprivation was a proximate cause and a natural and foreseeable consequence of these acts and omissions.

87.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff Estate of Tyler Kracht suffered injuries, damages, and losses.

88.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Kracht death, the physical and mental pain and anguish Mr. Kracht suffered before and during his shooting death, the loss of Mr. Kracht's relationships with his family, and other compensatory and special damages including but not limited to permanent lost earnings and earnings capacity of Mr. Kracht.

89.     Defendants' intentional actions or inactions, as described herein, intentionally deprived Mr. Kracht of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against each of the Defendants, and grant all relief as allowed by law and equity, including, but not limited to:

(a)     Declaratory and injunctive relief, as appropriate;

(b)     Economic losses on all claims allowed by law in an amount to be determined at

trial;

(c)     Compensatory and consequential damages, including, but not limited to, damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(f)     Pre- and post-judgment interest at the lawful rate;

(g)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF DEMANDS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

DATED this 2nd day of May 2022.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*
_____
Mari Newman
Reid Allison
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
mnewman@kln-law.com
rallison@kln-law.com

*Attorneys for Plaintiff*